```
                COMMONWEALTH OF KENTUCKY
                 DAVIESS CIRCUIT COURT
                      DIVISION I
               CIVIL ACTION NO. 10-CI-01759


KEVIN LEE PERRY, Individually, and
  as Administrator of the Estate of
MADONNA G. PERRY, Deceased; NATHANIEL
  PERRY, minor by his father and next friend,
  KEVIN LEE PERRY; and
ANDREA SMITH BUTLER                         PLAINTIFFS

 vs.

CHARLES F. HOBELMANN, III, MD;
DAVID A. DWYER, MD;
  EMERGENCY PHYSICIANS GROUP, P.S.C.;
THOMAS E. SONNANSTINE, IV, MD;
  CENTRAL KENTUCKY ADVANCED
  SURGERY & MEDICINE, PSC; AND
  OWENSBORO MEDICAL HEALTH SYSTEM, INC.   DEFENDANTS


        VIDEOTAPED DEPOSITION OF DR. DAVID A. DWYER

                    MARCH 29, 2012


The videotaped deposition of DR. DAVID A. DWYER was taken
pursuant to Notice on the 29th day of March, 2012,
beginning at approximately 2:15 p.m., at the offices of
FOREMAN*WATSON*HOLTREY, LLP, 530 Frederica Street,
Owensboro, Kentucky; said deposition was taken for any and
all purposes permitted by law.
```

```
APPEARANCES:  Hon. Travis L. Holtrey
              FOREMAN*WATSON*HOLTREY, LLP
              530 Frederica Street
              Owensboro, Kentucky  42303
              ATTORNEY FOR PLAINTIFFS

              Hon. Christopher Piekarski
              WHONSETLER & JOHNSON, PLLC
              11901 Brinley Avenue
              Louisville, Kentucky  40243
              ATTORNEY FOR CHARLES F. HOBELMANN, III, M.D.
              and DAVID A. DWYER, M.D.

              Hon. James P. Triona
              The Triona Firm
              2021 Auburn Avenue
              Cincinnati, Ohio  45219
              ATTORNEY FOR THOMAS E. SONNANSTINE IV, M.D.
              and CENTRAL KENTUCKY ADVANCED SURGERY
              & MEDICINE, P.S.C.

              Hon. Ronald Sheffer
              SHEFFER LAW OFFICE
              Suite 1450, National City Tower
              101 South Fifth Street
              Louisville, Kentucky  40202
              ATTORNEY FOR OWENSBORO MEDICAL HEALTH SYSTEM

       VIDEOTAPED DEPOSITION OF DR. DAVID A. DWYER

                    MARCH 29, 2012
                      I N D E X

CAPTION AND APPEARANCES: ----------------- 1-2
TESTIMONY OF DR. DWYER: ------------------ 3-
  Direct Examination by Mr. Holtrey: ----- 3-112
  Cross Examination by Mr. Sheffer: ------ 112-126
  Redirect Examination by Mr. Holtrey: --- 126-129
CERTIFICATE BY REPORTER: ----------------- 130
DEPONENT CERTIFICATION: ------------------ 131-132
EXHIBITS: -------------------------- Enclosed
```

THE WITNESS, BEING FIRST DULY SWORN UPON HIS OATH, TESTIFIED AS FOLLOWS:

DIRECT EXAMINATION BY HON. TRAVIS L. HOLTREY, ATTORNEY FOR PLAINTIFFS:

Q  Doctor, would you state your name and address, please?

A  David A. Dwyer, 11555 Indian Hill Road, Hawesville, Kentucky, 42348.

Q  That is the hardest road in this county to bike, I want you to know that.

A  Yeah, I know.

Q  I almost met my maker on that hill. Okay. Now that we're beyond that.

A  Is that because you got wore out or cause a car almost got you?

Q  Oh, horrible. No. It's a horrible hill to climb.

A  It's usually one or the other.

Q  Okay. Doctor, that is, I guess, your personal residence?

A  Uh-huh.

Q  What is your professional address?

A  OMHS, 811 East Parrish. And what is the address or the zip code there? 42303.

Q  And what is your position with OMHS?

A  I'm a partner in CEP, California Emergency Physicians America.

Q  And prior to being a partner in CEP America, were you with Emergency Physicians Group?

A  Yes. I was a partner with EPG.

Q  Did you ever resign that position prior to the merger or the acquisition of CEP?

A  No.

Q  Dr. Dwyer, I know that you've given several depositions such as the one we're here for today.

A  I've given one deposition before.

Q  Is that true? Only one?

A  Only one, yes.

Q  And do you recall, sir, what the name of that case that you gave a deposition in?

A  That was for Madge Bell and that was in a case in Texas. Oh, I testified in a case for Dr. Sayed.

Q  Okay.

A  Yeah. But I don't recall.

Q  So you've been through a deposition on more than one occasion?

A  You know, I don't recall that I did a deposition in that case. I did pretestimony work with his attorney, but I don't - - I think I just gave direct testimony.

**Page 37**

1  Q  Take it one step further. Do you think it
2  would significantly increased the likelihood of saving her
3  life?
4      MR. TRIONA: Object to form.
5      MR. PIEKARSKI: Object to form.
6  Q  Go ahead.
7  A  I don't know that I could say that. It
8  might be, you know, easy for people who are uninformed or
9  inexperienced with it to look at, you know, make that
10 conclusion, but the fact is we still really don't know
11 what caused her death and we're not, you know, we're not
12 certain that some other thing didn't come into play. She
13 was already receiving antibiotics. She was already had
14 plans for follow-up. Her wound had been drained. Would
15 it have turned out being - - would her outcome have been
16 different had she been admitted? So she'd have been
17 transferred to another hospital. That would have taken
18 several hours. Once she get there, Dr. Sonnanstine would
19 see her maybe later in the morning, usually. The
20 therapies that would be done would likely be IV fluids and
21 pain medication. She already had gotten antibiotics. As
22 far as acute therapies that would have been done, there
23 really wouldn't have been any different than what she had
24 going home. She had the antibiotics. She had - - you
25 know, what else would - - she wouldn't have had a lot of

**Page 38**

1  other therapies or diagnostic study done.
2      Q  At home could she have been observed by
3  professionals to watch her trend and vital signs?
4      A  Yes. I mean, you know, the family would
5  have been, could have been able to do, but I didn't - - we
6  didn't - -
7      Q  Did you instruct the family to do that?
8      A  We didn't talk to them about doing that.
9  We didn't talk to them about doing that. The question
10 though, you know, is if she had been in medical care and
11 someone had been watching her trend of vital signs, would
12 she have survived instead of died? Is that the question?
13     Q  More likely than not. I mean, I know you
14 can't speak with certainty, but within a reasonable degree
15 of medical probability would she have survived?
16     MR. PIEKARSKI: Object to form. He's not been
17 disclosed as an expert and now you're getting into the
18 role of asking him expert opinion.
19     Q  Go ahead.
20     A  Well, I don't think that we can say that.
21 I just don't think that we have the ability to peel the
22 onion back to that point where you can really say that
23 certainty one way or the other.
24     Q  Doctor, do you think you released an
25 unstable patient that night?

**Page 39**

1  A  It wasn't - - she was not unstable in my
2  opinion. She was alert, talkative, pleasant. Her pain
3  had been relieved.
4     Q  So if she was released with a heart rate
5  last measured of 142, it is not your opinion that she was
6  unstable?
7     A  She had a blood pressure of 130/80. She
8  had a good sat. She didn't - - she didn't - - I wouldn't
9  call her unstable.
10    Q  Okay. That's fair enough. That's your
11 opinion.
12    MR. PIEKARSKI: Travis, do you mind if we take a
13 quick break?
14    MR. HOLTREY: Sure. That's fine.
15    - - - - (OFF THE RECORD) - - - -
16    (Direct Examination continues by Mr. Holtrey:)
17    Q  Doctor, we took a short break and this is
18 not to insinuate or imply anything, but I always remind
19 that we're still under oath even though we took a break.
20 Okay. I'm sure that doesn't effect what you're going to
21 say, correct?
22    A  Yes. Correct.
23    Q  Doctor, earlier I was asking you when I was
24 trying to determine whether or not with the benefit of
25 hindsite you would change anything and we were going

**Page 40**

1  through those questions. You did say that, you know, you
2  had the opportunity to look back at Dr. Hobelmann's
3  work-up of the patient, correct?
4     A  Correct.
5     Q  And I think you've testified here today
6  that you actually looked back and saw what he had - -
7  about the conversation he had had with Dr. Sonnanstine,
8  correct?
9     A  Correct.
10    Q  And what was delinated by Dr. Sonnanstine
11 to Dr. Hobelmann and everything. Is that correct?
12    A  Yes.
13    Q  And so when did you do that? That night?
14    A  That night at the time that I saw her.
15    Q  Doctor, if you could, please, turn to Page
16 13 of the chart.
17    A  The chart is this one, Number 2?
18    Q  Yes. While you're turning there, what
19 time - - do you have any recollection of what time you
20 were - - you came on shift that day?
21    A  I don't know if I was working a 12 to
22 midnight or a 6p to 6a.
23    Q  All right. But no question she returned to
24 the hospital a little after 6 p.m. that evening and was
25 discharged, I think, a little after 8:30 p.m. that

1  Q  And what's "percuss" mean?
2  A  Tap.
3  Q  So she had made complaints about back pain,
4  but based upon this examination you didn't find anything
5  that I guess would be the source of that back pain. Is
6  that correct?
7  A  Correct.
8  Q  Go ahead.
9  A  Specifically it says the "CVA tenderness"
10 or Lloyd's sign is what that is. That's when you tap on
11 the back on either side and see if they have, if that
12 elicits pain, and she didn't have that.
13 Q  So if she didn't have any of the findings
14 that would be associated I guess with a musculoskeletal
15 type complaints of the back yet she had back pain, does
16 that help you identify that perhaps what's creating back
17 pain or the symptom of back pain is something that's not
18 really associated with the muscles or the skeletal system
19 of the back. Is that correct?
20 A  Correct.
21 Q  Then you go on with the extremities and the
22 neuropsych and you've made the marks that you felt
23 appropriate based upon the examination, correct?
24 A  Correct.
25 Q  You did not order any labs or x-rays. Am I
                                                          93

1  correct?
2  A  Correct.
3  Q  You did not order any testing at all with
4  regards to Ms. Perry, correct?
5  A  Correct.
6  Q  Then under your "progress," what do you
7  have written there?
8  A  It's "CT scan was fine."
9  Q  Is that "earlier"?
10 A  Yes, "earlier was fine." And "see add-on."
11 Q  Okay. Now, add-on is another sheet that
12 you have in your chart, correct?
13 A  "Add-on" would specifically refer to this
14 sheet that you've got, 37.
15 Q  And that's Page 37?
16 A  Yes.
17 Q  In fact, in the lower left-hand it's
18 referred to as the "EPG ADD-On," correct?
19 A  Yes.
20 Q  Before we get to that when you say "see
21 add-on" that just means you've made additional notes –
22 A  Yes.
23 Q  – that we need to look somewhere else for?
24 A  Yes.
25 Q  All right. Now, under "Clinical
                                                          94

1  Impression," Doctor, earlier I asked you a question what
2  was your working diagnosis, and I know sometimes we don't
3  want to interchangeably use words, but did you take my
4  question of working diagnosis to be your clinical
5  impression?
6  A  Sort of.
7  Q  Okay. Go ahead and explain what your
8  clinical impression was.
9  A  My clinical impression was that she had
10 post-op abdominal pain and a wound infection.
11 Q  Okay. And to treat the post-op abdominal
12 pain you chose medication?
13 A  Correct.
14 Q  Specifically Dilaudid?
15 A  Dilaudid is what she received in the
16 emergency room and then Percocet also.
17 Q  Did you just instruct her to take the
18 Percocet that had previously been prescribed by Dr.
19 Hobelmann?
20 A  She had been given a Percocet in the
21 emergency room and observed over time to make sure she
22 didn't vomit it again.
23 Q  And then the Number 2 on your clinical
24 impression was "wound infection"?
25 A  Correct.
                                                          95

1  Q  But I think earlier you've testified you
2  didn't undertake any treatments specifically to address
3  anything more with the wound because that had been done by
4  Dr. Hobelmann two and a half, three hours earlier?
5  A  Correct. That would have been initiated.
6  Q  Nothing here as in Number 3 or Number 4
7  talks about dehydration or anything of that nature,
8  correct?
9  A  Correct.
10 Q  As far as your clinical impression?
11 A  Correct. That isn't recorded there.
12 Q  Okay. The "D" with a long line out of it,
13 I guess, is your signature?
14 A  Yes.
15 Q  Is that right?
16 A  Yes. That's my signature.
17 Q  Then on "disposition," Doctor, what does
18 that say?
19 A  For her to fill the script. You're talking
20 about that over on Page 37?
21 Q  No. Right underneath your signature it
22 says "disposition."
23 A  Those checked boxes?
24 Q  Yes.
25 A  "Home. Discharged with instructions.
                                                          96

:::: page

1  Improved.  Stable."
2       Q    Wouldn't you have done this same time
3  subsequent to - - well, when would you have filled those
4  blocks out?
5       A    Those blocks are normally filled out just
6  prior to putting the chart in the discharge rack for the
7  nurse to take it and then send them home.
8       Q    So earlier I asked you if you thought when
9  you discharged Ms. Perry if she was unstable and you
10 disagreed with me, and I guess this would be where you
11 indicated you believed based upon your treatment of her
12 that she was a stable patient, correct?
13      A    Yes.
14      Q    All right, Doctor.  Looking at your add-on
15 sheet.  Now, what's the purpose of the add-on sheet?
16      A    Well, if you've run out of room on the T
17 system sheet.
18      Q    Okay.  Where on the T system sheet is a
19 place for you to put your orders?
20      A    The T system sheet is used in different
21 ways by physicians.  The way that we normally use it at
22 the hospital here is to circle things on the chart that
23 you want done as orders.
24      Q    That would be the testing, the labs and the
25 x-rays, etcetera?

97

1       A    Correct.  And then on the very small block
2  where it says "progress," we'll sometimes also write in
3  other things, and then running out of room there we'll
4  switch to the add-on sheet and there's a long column on
5  the left for writing progress.  That's referred normally,
6  released normally for the physician to do.
7            I thought I turned that off.
8            And then on the right is where we write orders
9  for the nurses to do and oftentimes use that lower right
10 block to write out the plan.
11      Q    Doctor, could you take me through the
12 orders that are listed on the add-on sheet and are those
13 in your writing?
14      A    Yes, they are.
15      Q    Okay.  Go ahead.
16      A    The order for her to get Dilaudid and
17 Zofran, and the order for a dose of Bactrim to be given,
18 and then an order for a dose of Percocet to be given.  And
19 to wait about 30 minutes after the first two doses before
20 you give the Percocet.  I must have written all three of
21 those down, but I didn't want her to get everything at
22 once.
23      Q    When you say that you wanted the Percocet
24 given in 30 minutes and you say after the first two, are
25 you talking about the first two administrations of the

98

1  Dilaudid?
2       A    Yeah.  After the Dilaudid was given, then I
3  wanted her to get the Bactrim, and then I wanted her
4  specifically to get the Percocet with a 30-minute window,
5  because I didn't want to have her nauseous or vomiting and
6  then getting the Percocet.
7       Q    Okay.  Doctor, there's a scratch through it
8  looks like 325 and instead 650.  What is that?
9       A    Percocet comes in different combinations of
10 the Percocet - - of the Oxycodone and Tylenol.
11      Q    Okay.
12      A    And they had 10/650.  They didn't have a
13 10/325.
14      Q    Now, there are initials - - there's like a
15 line connecting all three of these where it says Dilaudid
16 all the way down to Percocet and on the inside of that
17 line there are some initials there.
18      A    Yes.
19      Q    Whose are those?
20      A    There's two sets of initials.
21      Q    Okay.
22      A    There's one on the outside that's circled,
23 and then there's one on the inside.  Those are notations
24 that the nurses made.
25      Q    Okay.  And those notations that the nurses

99

1  made, does that tell the reader and tell you or anyone
2  that they did, in fact, carry out these orders?  Was that
3  what that means to you?
4       A    It means that they've seen the order and
5  acknowledged it.
6       Q    Okay.
7       A    And then when they write the medicine dose
8  on their sheet, you know that they've done it.
9       Q    Got you.
10      A    So the accounting isn't always - - you
11 know, this just means that they've seen the order and
12 they've acknowledged it.
13      Q    Now, if you had in fact ordered the
14 administration of 500 cc normal saline and it was properly
15 charted, would this be where we would look to see if you
16 had made that order?
17      A    You'd likely find it below the medication
18 orders as, you know, read the order and then VO, RBV, mean
19 verbal order, read back verified, and then the nurse's
20 initial on top.
21      Q    And then underneath this it has "plan."
22 Did you write the word "plan"?
23      A    Yes.
24      Q    And under "plan" you have two things.  You
25 have fill the prescription, correct?

100